Argued and submitted June 10,
affirmed as modified August 18, 1980

# BROCKMILLER et al,
*Respondents,*
*v.*
# ALDRICH et al,
*Appellants.*

(No. 78-31, CA 14176)

615 P2d 1086

Maurice V. Engelgau, Coquille, argued the cause for appellants. With him on the brief was Engelgau and Hogan, Coquille.

Richard A. Stark, Medford, argued the cause and filed the brief for respondents.

Before Schwab, Chief Judge, and Thornton and Richardson, Judges.

THORNTON, J.

## THORNTON, J.

Plaintiffs brought suit in equity in the circuit court to establish an easement over defendants' lands for road and utilities purposes.

Following a two-day trial the court gave an oral opinion from the bench holding that plaintiffs were entitled to the easement as prayed for in their complaint. The complaint set forth four theories for relief: implied reservation of easement, covenants running with the land for utility purposes, estoppel, and prescriptive easement for roadway and utility purposes. Plaintiffs abandoned their claim of prescriptive easement at trial. The trial court found for plaintiffs on the other three theories. Defendants appeal assigning as error the following:

1) Ruling that plaintiffs were entitled to an implied easement for roadway and utility purposes across defendants' lands.

2) Ruling that defendants' lands are subject to utility easement covenants running with the land.

3) Ruling that defendants are estopped to deny plaintiffs' right to the above easement.

4) Establishing the width of the roadway easement at 50 feet with actual use as a road for ingress and egress limited to 12 1/2 feet on each side of the centerline.

The following are the essential facts:

Plaintiffs and defendants are contract purchasers of two adjacent tracts of land near Ten Mile Lake in Coos County. Both parties purchased from the same grantors, in April and March, 1977, respectively.

Both plaintiffs and defendants were introduced to the respective properties by and dealt with a realtor by the name of George Gebhardt, who had

been employed by the sellers to assist them in selling the property.

Prior to the execution of defendants' contract, they entered into an earnest money agreement which provided that defendants agreed to provide "limited access to adjacent property owners."

At the time that plaintiffs and defendants looked at their respective tracts, the road in question ran through defendants' property to plaintiffs' property, although it was in an unimproved condition at that time. Mr. Gebhardt testified that he and Mr. Aldrich, one of defendants, walked up the road before defendants purchased the property onto plaintiffs' property and that Aldrich was told by Gebhardt that the adjacent property owners needed access through his property. At that time, Mr. Gebhardt believed that the road in question was a county road and told plaintiffs that it was a public road.

Defendant Aldrich was involved with Gebhardt in locating the corners of the property and was fully familiar with the area of the road. As Gebhardt stated, there was no other passable road to plaintiffs' property.

After purchasing the property, plaintiffs did some work on the land that they had purchased, cutting brush and wood and making preparations to move their horses onto the property and to build a corral. In the summer of 1977, plaintiffs told defendants that they intended to move a mobile home onto the property and that they were going to widen the road and make other improvements to the road so that it would be completely winterized. Aldrich inquired about how much room would be needed to turn onto the road to enable the mobile home to be taken up the road. He also suggested putting a three-way key on the gate so the public could be kept out and other parties would not have access to the gate. He originally also had discussions with plaintiffs Maxine Reed and Linda

Reed that they should put a sign up on the road to try to keep the public out and so that people would not use the road. Aldrich did not deny the discussions about the public road nor the discussions about moving a trailer on the premises. Aldrich was also informed that they intended to install an underground cable system for utilities, and he offered no objections to their plans to do so. Aldrich was present when the cost of the underground utility cable was discussed. In mid-September, Aldrich watched plaintiffs place rock on the road and dig a ditch for underground utilities without objection. However, shortly thereafter defendants formally protested the digging to the office of the local electric utility.

Previously that summer, plaintiffs had learned from the power company that the road was not a dedicated county road. They told this to Aldrich in June but he did not make any statement at that time that plaintiffs could not use the road. No other road was mentioned to plaintiffs as a possible means of access to their property. At one time there was a dedication of record for another road into the property, but this roadway had never been developed and the terrain was extremely steep.

After the earnest money agreements were signed, Aldrich was present during a conversation between George Gebhardt and plaintiffs where it was discussed that adjoining property owners would have to give easements and access, and at no time did he indicate that he would be unwilling to grant the required easements for utilities and access.

In 1970, a document entitled "Restricted Covenants Conditions and Restrictions, Majestic Shores Subdivision" had been recorded. The property later to be purchased by both plaintiffs and defendants was included in the description on page 1 of the recorded document. These covenants provided:

"Easements. Perpetual easements will be reserved for utility and draining installations, maintenance

[839]

and replacement, under and upon the ground and at locations and widths as may be determined by the present owner. Such reservations shall include the right of ingress and egress from and all parcels in any manner necessary or convenient for the construction, maintenance or removal of equipment. Public utility and drainage equipment and installation may be constructed, maintained and placed on said easements without obtaining the consent of the owners of said property and without the payment of damages or other compensation therefor."

Emmett Jackson, one of the owners who signed the Covenants and Restrictions, testified that he had prepared a preliminary map, entered into evidence, which identified the road in issue as Highland Drive. Jackson himself had constructed this road and was under the impression that the old dedicated road had been vacated. Jackson also stated that the originally dedicated public road could not be improved adequately. Several people testified that the road in issue had been in existence for many years, was apparent and had been used for access to plaintiffs' property. All testified that the road was passable by various types of vehicles.

On October 4, 1977, Aldrich closed off the road by felling some trees over the portion of the road that passed through his property. This litigation ensued.

In defendants' contract, there was a reservation of an easement to the sellers as follows:

"Sellers do hereby reserve a perpetual, nonexclusive easement on an existing logging road to service a parcel owned by the sellers in the South Half of the Northeast one-quarter and in the North half of the Southeast one-quarter of Section 29, Township 23 South, Range 12 West of the Willamette Meridian, Coos County, Oregon. Parties agree to execute documents necessary to create the easements."

According to sellers' attorney, Wurtz, and one of the sellers of the property, Mr. Fitch, this reservation of easements contained an erroneous description

of the real property. Fitch testified that it was his intention in that reservation to give access to the two 40-acre parcels which were eventually purchased by plaintiffs. In his opinion, the word "service" in that provision meant service for residential purposes, including an easement for power, water, sewer, etc. Attorney Wurtz testified that to his knowledge the sellers never owned the property described in the reservation, and that the reference in the contract was in error. Wurtz stated that the reservation should have referred to property owned by the sellers at that time, which is the same property that, at the time of trial, was owned by Gebhardt (40 acres) and plaintiffs (two 40-acre parcels). Wurtz also stated that the word "service" was intended to mean access as well as necessary easement for utilities, etc.

■    After our *de novo* review of this record and an examination of the authorities, we agree with the trial judge that the evidence establishes an implied easement for ingress and egress over the road in issue in favor of plaintiffs, and that plaintiffs were entitled to a decree. *Cheney v. Mueller,* 259 Or 108, 485 P2d 1218 (1971); *Rose v. Denn,* 188 Or 1, 212 P2d 1077, 213 P2d 810 (1949).

In *Cheney,* our Supreme Court reiterated that the factors to be considered in determining whether circumstances justified the finding of an implied easement are those set forth in 5 Restatement, Property § 476. 259 Or at 118. Application of those factors in this case weighs in favor of plaintiffs. The earnest money agreement signed by defendants provided that they would allow limited access to adjoining landowners. Although the reservation of easement in the land sale contract that followed contained an error in designating the dominant estate, it does not appear that defendants were misled by it. We are satisfied that the purpose of the reservation was to reserve to the grantors an easement over the road in issue here. The evidence in the record suggests that this road was the

[841]

only feasible means of access to plaintiffs' parcel. The only other possible road (the dedicated but unconstructed public road) was located in steep terrain and was unsuitable for road purposes. Finally, the road in question had been partially improved by Mr. Jackson and used as access to plaintiffs' parcel in the past, although not extensively. Plaintiffs themselves used this road for some time before the dispute arose, with defendants' knowledge and apparent approval.

Defendants, by permitting plaintiffs to use the road to install utilities and to make improvements to the road and their adjacent property, and by making no objections to these actions, were arguably estopped to deny the existence of said easement.

■ We find that the utility easement set forth in the recorded restrictive covenants for the Majestic Shores Subdivision ("Restrictive Covenants, Conditions and Restrictions, Majestic Shores Subdivision") is applicable to defendants' parcel, and the decree properly included the right to construct such utilities within the scope of the easement.

■ Next, we find no error in that portion of the decree establishing the width of the roadway easement at 50 feet, with actual use to 12 1/2 feet on each side of the centerline. This appears to conform to the orally expressed intent of the trial court. We note that a copy of the proposed decree containing the challenged provision was submitted to defendants' counsel at the conclusion of the trial at the same time it was submitted to the trial judge. Defendants, although of course objecting at the conclusion of the trial to the granting of any easement whatsoever over their tract, did not offer any further objection to the form of the proposed decree.

■ Finally, it appears that the decree does not specify that the installation of utility lines provided for be underground. The evidence establishes that it was the intent of the parties that the easement so provide.

Affirmed as modified.