Argued May 3, affirmed June 10, 1971

## CHENEY ET AL, *Respondents, v.*
## MUELLER ET UX, *Appellants.*

485 P2d 1218

J. R. CAMPBELL, Judge.

*Phillip M. Roberts,* Prineville, argued the cause for appellants. With him on the brief was Ralph J. Brown, Prineville.

No appearance contra.

Before McAllister, Presiding Justice, and Denecke, Holman, Tongue, Howell and Bryson, Justices.

TONGUE, J.

Defendants appeal from a judgment granting to plaintiffs an easement by implied reservation across defendants' property.

Plaintiffs' complaint, after alleging the facts, asked that the deed from plaintiffs to defendants be reformed to include a reference to "existing rights of way for roads"; that defendants be enjoined from blocking the access road to a house subsequently sold by plaintiffs to a Mr. Hansen and "for such other and further relief as to the court seems just and equitable." Defendants' answer, in addition to a general denial, also asked for affirmative relief requiring plaintiffs to deliver a warranty deed subject only to easements of record, and thus excluding the disputed access road.

Since the granting of an easement by implied reservation depends primarily upon a determination of the intent of the parties, as reflected by their conduct and in the light of the particular facts and circumstances, the principal question in this case is one of fact.

In November 1958 plaintiffs sold to defendants the property in question, consisting of a service station and trailer park near Prineville, Oregon. At that time plaintiffs also owned adjacent property on the west of the trailer court. Both tracts fronted to the south on a highway running west to Prineville. Plaintiffs also

then owned property to the north of the trailer court and had previously owned property adjacent to it both on the west and the east. In selling the property to the east of the trailer court a road easement eight feet in width was provided, running north and south along the east side of the trailer court property so as to provide access to the purchasers of portions of the property northeast and east of it. The original tract owned by plaintiffs (before these sales) included 33 acres and was purchased by them in 1947.

At the time of the sale to defendants the plaintiffs owned two houses on the property immediately west of the trailer court, one of which also fronted on the highway. The other house (later sold to Mr. Hansen and called the "Hansen house" throughout this case) was built in 1948 by Mr. Cheney, who then lived in it for a time. At the time of the sale of the trailer court to defendants the "Hansen house" was occupied by a Mrs. Baker, who was employed by plaintiffs in operating the trailer court. The access to that house is the problem in this case.

At that time, of course, there was no legal problem of access to the "Hansen house," since both that house and the adjacent property to the east, as well as to the south, were all owned by plaintiffs. As a practical matter, however, access to the car port on the east side of that house was provided by a roadway extending in a general easterly or southeasterly direction from that car port across the trailer park to the eight foot road easement extending along the east side of the trailer park property. At that time there was also a fence between plaintiffs' trailer park property and their adjacent property to the west, including the "Hansen house." However, a wire gate was provided

in that fence for the roadway to that house at a point immediately opposite the entrance to the car port of that house. All previous occupants of the "Hansen house" used that roadway for access.

Prior to the sale to defendants a map had been prepared by a surveyor of the trailer park property and the property immediately north of it. That map also showed four tracts of property to the east of the trailer park, as previously sold by plaintiffs, together with a dotted line to show the location of the eight foot road easement extending along the east side of the trailer park property so as to provide access to three of such tracts. The map also included a metes and bounds description of that road easement, after which followed the words: "Subject to all existing easements and rights of way."

The map also showed a similar dotted line parallel to the north line of the trailer park property so as to indicate a strip of the same width extending along the north side of that tract and between it and the tract immediately north of the trailer court property. No metes and bounds description for that strip was shown on the map. The map did not show the location of the "Hansen house" or the gate opposite its car port. The surveyor who prepared that map testified that he added that "dotted line" at the request of Mr. Cheney after completing the remainder of the map and for that reason did not include a metes and bounds description of it. He also testified that the usual way to show an easement on a survey map is by dotted lines. He did not know whether the strip as shown by these dotted lines corresponded to any existing roadway. The evidence showed, however, that the west end of that strip terminated at or about the location of the gate opposite the "Hansen house" car port.

On the evening of Saturday, November 25, 1967, defendants came to look at the trailer park in response to an advertisement placed by plaintiffs and after corresponding with them. That same evening they also drove up to look at the "Hansen house," which was also for sale, Mr. Mueller having found out how to get to that house. In doing so, defendants drove through the trailer court and through the gate opposite the car port of that house, but said that they did not see the gate, which may have been open at that time.

The next day defendants also walked over the trailer court property. Meanwhile, there had been a light snow. They testified that they saw no car tracks in the snow leading across the trailer court property to the "Hansen house" (where they had driven the night before).

Defendants admitted that in showing them the trailer court property the next day Mr. Cheney showed them a map "like" the one which showed the "strip" by a dotted line running east and west along the north line of the trailer court property. Defendants also said that they asked if that map had been recorded, but did not rely on it. Defendants testified that there was no discussion of that "strip" or of any roadway or right of way to the "Hansen house." They also testified that there was no "defined roadway" at that time and that there could have been no roadway along the "strip" shown on the map because of a four foot "bank" at the west end of that "strip."

Plaintiffs testified, on the contrary, that in showing defendants the property they not only showed defendants the map in going over the property, but informed them of the roadway, although admitting that "nothing in particular" was said about it. Mr. Cheney

also testified that the "tracks" on the roadway through the gate to the "Hansen house" were "plain" at that time. He also testified that he had previously put rock on that roadway.

After looking at the trailer court property, defendants decided also to buy the tract immediately north of it (and north of the "strip" as shown on the map along the boundary of that tract). A price was then agreed upon for both tracts and an earnest money contract was then prepared by plaintiffs' attorney and signed by both parties on November 28, 1967. A copy of the same survey map, showing the same "strip" in dotted lines, was referred to and attached, as well as a legal description, which included a metes and bounds description of the road easement along the east side of the property and also again added "subject to all existing easement and rights of way."

The attorney then prepared a formal contract, dated December 5, 1967, which included the same description, but added the words, "subject to other existing easements and rights of ways *now of record if any*." Later, however, on payment of the contract, a deed was prepared by the same attorney and executed on August 15, 1968, with a description in substantially the same terms as the earnest money contract ("also subject to existing rights of way for roads"), but not including either the limitation "now of record if any" or reference to the word "easements," as included in the contract of sale.

After executing the earnest money receipt defendants returned to their home in Alaska and did not take possession of the property until March or April 1968. Meanwhile, Mrs. Baker operated the trailer court for them and continued to live in the "Hansen house"

until July 1968. During that time she continued to use the same roadway for access to the house, without objection by defendants. At that time, however, she was still employed by them.

After Mrs. Baker moved out, the house was vacant until sold by plaintiffs to Mr. Hansen. On May 5, 1969, plaintiffs sold the "Hansen house" to Mr. Hansen, showed him the same map, and told him that there was an easement across the Mueller property to the roadway along the east side of that property. The contract of sale to Hansen made no reference to any access roadway or easement, but describes only the tract actually conveyed and which is adjacent to the trailer park on the west. That tract is also adjacent to plaintiffs' remaining property (and house), which was also adjacent to the trailer park on the west, but south of the "Hansen house" and between it and the highway.

Mr. Mueller also testified that he never heard of an easement to the "Hansen house" until after Mr. Hansen moved in; that he then went to see the attorney who prepared the deed, who told him there was no such easement, and that when he first talked to Mr. Hansen about it, Hansen agreed to find another way into the house, but wanted "a couple of weeks" to do so; that Mueller then waited several weeks and then put up a fence to close off the access to the "Hansen house" across his property. During that period, according to Mr. Mueller, the traffic to the "Hansen house" was getting "unbearable" and on one occasion a party at the house late at night kept the "whole trailer court awake." Defendants also complained of the dust and noise resulting from use of the roadway by Mr. Hansen as not good for the trailer court business and said that customers had complained to them.

According to Mr. Cheney, however, after defendants built the fence and blocked access to the "Hansen house," he went to see Mr. Mueller and said "don't you know the easement is there" and that Mr. Mueller said, "Well, yes, I know it's there," but "I don't know for what purpose." Mr. Cheney also testified that after the sale to Mr. Hansen, and apparently before that conversation, Mr. Mueller came to him and said that he was "fifty feet too far down the hill with the road easement" (the east-west "strip" in question) and that they then "chained" it together and found that it was "within one foot." He also testified that defendants then asked to move it four feet up the hill and that he said that he didn't think Mr. Hansen would object "as long as it's put on the map and you rebuild the road as it now is with rock on it."

Defendants denied any such conversation and denied that there was any rock on the roadway when they bought this property and said that the only measurement they made with Mr. Cheney was to find a stake on the east line of the property and that this was in 1968. Mrs. Mueller stated, however, that what they were objecting to was not the Hansens using the road, but the manner in which they used it, including use late at night.

Plaintiffs also offered evidence that, according to records showing the amounts of periodic gasoline and oil deliveries to defendants, their business increased in 1969 over 1968, showing that it had not been damaged by use of the roadway by Mr. Hansen.

It appears from the evidence that for some time after defendants built the fence Mr. Hansen was obliged to get to his house by driving across lands owned by a third party to the west of his house, but

leading to the back door on the west side of the house, rather than to the car port on the east side of the house. It also appears from the evidence that other access to the highway would have required building a road directly to the south from the "Hansen house" across the lot retained by plaintiffs between the "Hansen house" and the highway, but this apparently would have required removal of a "rock house" building.

In addition, it appears that after purchasing the trailer court Mr. Mueller made some changes in the area immediately east of the Hansen car port and that the actual roadway leading to the "Hansen house" does not follow the exact location of the eight foot "strip" on the map, but proceeds from the car port in more of a southeasterly direction across defendants' property to the roadway along the east side of that property. The record also shows that the trial judge viewed the property and observed that it would not be practical to run a road "as shown on the map."

1. This court has previously recognized that an easement may be created by implication in favor of either the grantor or grantee. *Rose et ux v. Denn,* 188 Or 1, 19, 212 P2d 1077, 213 P2d 810 (1950). It has also recognized, however, that implied easements are not favored by the courts and that a plaintiff has the burden of establishing such an easement. *Dressler et al v. Isaacs et al,* 217 Or 586, 596, 343 P2d 714 (1959).

2. In addition, this court in *Rose* and *Dressler* approved the rule as stated in 5 Restatement, Property § 476, setting forth the following factors as "important" in determining "whether the circumstances under which a conveyance of land (was) made imply an easement":

"(a) whether the claimant is the conveyor or the conveyee,

"(b) the terms of the conveyance,
"(c) the consideration given for it,
"(d) whether the claim is made against a simultaneous conveyee,
"(e) the extent of necessity of the easement to the claimant,
"(f) whether reciprocal benefits result to the conveyor and the conveyee,
"(g) the manner in which the land was used prior to its conveyance, and
"(h) the extent to which the manner of prior use was or might have been known to the parties."

As stated in Comment (a), under § 476, these facts are "variables rather than absolutes" and "None can be given a fixed value." The reason for considering these factors, as stated in *Dressler,* at 597, is that:

"At the time of the severance of the land the circumstances must be such as to permit an inference that had the grantor put his mind to the matter he would have intended the servitude to be created. * * * ."

(See also Comment (a), § 476, but see *Rose v. Denn, supra,* at 43.)

As also stated in *Dressler,* however, at p 599:

"We think that the proper adjustment of the conflicting claims of the parties in this type of case can be arrived at more directly by attempting to determine what a reasonable grantee would be justified in expecting as a part of his bargain when he purchases land under the particular circumstances. * * * ."

3. After considering the entire record in this case in the light of these various "factors," and also bearing in mind that while this is a suit in equity, determinations by the trial court based upon conflicting evidence are entitled to considerable weight, we have

concluded that the trial court was correct in finding an easement by implied reservation in this case.

Of the various factors to be considered in reaching this result the following are controlling, in our opinion, under the facts of this case:

(1) *The terms of the conveyance.*

4. The terms of the conveyance by plaintiffs to defendants, while not alone sufficient to reserve such an easement, at least did not expressly warrant against any such easement (cf. Comment d, § 476) and, on the contrary, included the words "also subject to existing rights of way for roads" and omitted the additional term "now of record," as used in the preceding contract.

(2) *The prior use of the roadway.*

5. Although prior use of a roadway on land subsequently conveyed, but while still also owned by the grantor, cannot of itself establish an easement, nevertheless, as stated in Comment i under § 476:

"The inference of intention is strengthened by the extent to which the prior use has resulted in a physical adaptation of the premises to such use. * * *"

(3) *Extent of knowledge of prior use.*

While defendants in this case denied knowledge of the prior use of the easement in dispute by occupants of the "Hansen house," in walking over the trailer court property prior to its purchase they could hardly have failed to notice that the car port of that house faced the trailer court property, with an apparently open gate in front of the car port. Indeed,

they had themselves driven to that house across the trailer court the night before. In addition, plaintiffs testified that on showing the property to defendants mention was made of the roadway to that house and that he showed them a map (later attached to the earnest money contract) on which an eight foot "strip" across the property at that approximate location was marked by dotted lines in the same manner as the admitted roadway easement along the east side of the property. As stated in Comment j, § 476:

> "To draw such an inference the prior use must have been known to the parties at the time of the conveyance, or, at least, have been within the possibility of their knowledge at that time. Each party to a conveyance is bound not merely to what he intended, but also to what he might reasonably have foreseen the other party to the conveyance expected. Parties to a conveyance may, therefore, be assumed to intend the continuance of uses known to them which are in a considerable degree necessary to the continued usefulness of the land. * * * The degree of necessity required to imply an easement in favor of the conveyor is greater than that required in the case of the conveyee (see Comment c). Yet, even in the case of the conveyor, the implication from necessity will be aided by a previous use made apparent by the physical adaptation of the premises to it."

In addition, as stated in Comment i, § 476:

> "The fact that a use has been made may justify the inference that it was intended to continue though the degree of necessity existing is less than would be required for the implication of an easement on the basis of necessity alone. * * *."

(4) *Extent of necessity for easement.*

This leaves for consideration the factor of "the extent of necessity of the easement to the claimant."

We have previously held in *Dressler v. Isaacs, supra,* at 598:

"Reasonable need for the use of an easement is a flexible concept which may be described by an infinite range of circumstances; at one extreme it could mean that without the claimed right no effective use could be made of the alleged dominant estate, and at the other extreme it could mean that the use of that estate would be less convenient only. * * * "

As also held by this court in *Jack v. Hunt et ux,* 200 Or 263, 264 P2d 461, 265 P2d 251 (1953), at 269:

"We are of the opinion that in matters of this kind the rule should be less strict than that of absolute and indispensable necessity. However, such a rule of reasonable necessity should not be grounded in mere convenience, but rather in the necessity appearing from the apparent purpose, the adaptability, and the known use to which the property is to be put. This so that the court may say that the parties as reasonable men contemplated and duly considered the continued use of the quasi easement claimed as necessary to a reasonable enjoyment of the dominant estate at the time of conveyance."

6. We nevertheless recognize, as held in *Dressler,* at p 603, that "Ordinarily, if the dominant land can be used without an easement by a reasonable expenditure the factor of necessity is lacking."

7. Although the extent of necessity for the easement in this case is not as strong as the other "factors" previously mentioned, we nevertheless feel constrained to agree that the fact of the previous use of the roadway, as testified to by plaintiffs' witnesses, and the fact that defendants knew of such use, according to such testimony, justifies the inference that the parties intended that the use of the roadway by the occupant of the

"Hansen house" continue, even though not absolutely necessary. This inference is further strengthened by the testimony (although denied by defendants), that defendant Mueller, after the sale to Mr. Hansen, instead of immediately objecting to plaintiffs, stated only that the "strip" for the roadway as shown on the map appeared to be too far south. In addition, the alternate means of access would be expensive. Access across the land to the west would require its purchase from the owner of that land and access to the south would apparently require the moving of a building.

8, 9. Accordingly, we find that the circumstances of this case are such as not only to "permit the inference that had the grantor put his mind to the matter he would have intended the servitude to be created," but also that this same result follows, under the facts of this case, when considered from the standpoint of "the reasonable expectations of a reasonable man receiving (such) conveyance of land" (to paraphrase *Dressler,* at pp 597 and 600). We also agree with the trial judge, however, in holding that since an easement along the "strip" as shown on the map would be impractical, the easement should follow the traveled portion of the roadway to the easement along the east boundary of the Mueller property, with plaintiffs to pay the cost of any necessary survey.

10. Defendants contend that *Jack v. Hunt, supra,* is controlling and requires a contrary result, but we find the facts of that case to be quite different. We agree with defendants' further contention that there is a well defined distinction between an implied grant and an implied reservation and that the law will imply an easement in favor of a grantee more readily than in favor of a grantor. Whether the claimant is the grantor or grantee, however, is only one of the various factors to

be considered under Restatement § 476, as previously approved by this court.

11, 12. Defendants also contend that there was no clearly defined existing roadway, but there was a conflict of the testimony on that subject, just as there was with reference to the various conversations between the parties. We also reject defendants' contention that plaintiffs' proof was not sufficiently "clear and convincing," and hold that it was sufficient to establish that "the truth of the facts was highly probable," so as to satisfy the test of *Cook v. Michael,* 214 Or 513, 514, 330 P2d 1026 (1958).

13. Defendants' final contention is that since plaintiffs' complaint prayed for a reformation of the deed to include such an easement, the court erred in granting an easement on a theory of implied reservation. It appears from the record, however, that plaintiffs' complaint not only pleaded all of the facts necessary for relief on such a theory, but also included a prayer for "such other and further relief as to the court seems just and equitable." In addition, prior to resting their opening case, plaintiffs' counsel stated the contention that they were entitled to relief on a theory of a reservation of a quasi-easement by implication. Defendants made no claim of surprise, but proceeded with the trial without objection. Cf. *Schroeder v. Schaeffer,* 258 Or 444, 477 P2d 720 (1970), 258 Or 414, 483 P2d 818 (1971).

For all of these reasons, the judgment and decree of the trial court is affirmed, without costs to either party.